**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cherie Macaraeg, et al., | No. CV-23-00990-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Dignity Health, | |
| Defendant. | |

Before the Court is Defendant Dignity Health's Motion for Summary Judgment (Doc. 53). The motion is fully briefed. (Docs. 53, 65, 67, 71, 72.)[1] The Court held oral argument on May 27, 2025.

**I.   BACKGROUND**

Marie Rose Lennox Wing was deaf and used American Sign Language ("ASL") to communicate. (*See* Doc. 71 at 24:23-25:2.) After falling outside her home, Ms. Wing was taken to the emergency room at Chandler Regional Medical Center—a hospital operated by Dignity Health. (*Id.* at 114; Doc. 1 ¶ 10; Doc. 11 ¶ 10.) She received a CT scan, X-rays, and treatment for abrasions on her knees and elbows. (Doc. 71 at 114-15.) Ms. Wing's granddaughter, Plaintiff Clair Rosewood, acted as an ASL interpreter during the visit. (*See id.* at 103:4-19, 114.)

About two weeks later, Ms. Wing was taken to Mercy Gilbert Medical Center—another Dignity Health hospital—with severe pain and confusion. (*See id.* at

---

[1] Both parties filed sealed exhibits with their motion briefing. The five docket entries represent the parties' briefing and accompanying exhibits.

65:1-19; Doc. 1 ¶ 10; Doc. 11 ¶ 10.) Hospital staff attributed her condition to dehydration and a previously undiagnosed rib fracture. (*See* Doc. 71 at 116-17.) Ms. Wing was treated there for eight days. (*See id.* at 116.) Despite complaining of increasing pelvic pain throughout her stay, hospital staff believed Ms. Wing's condition had stabilized to the point where discharge to a rehabilitation facility was appropriate. (*See id.*) Ms. Wing's daughter, Plaintiff Cherie Macaraeg, was at the hospital every day during the first stay. (*Id.* at 77:11-15.) She provided some interpretive assistance between her mother and hospital staff. (*See id.* at 75:12-76:11.)

Ms. Wing spent five days at a rehabilitation facility. (*Id.* at 126-27.) Her granddaughter, Plaintiff Audrey Bumbernick, visited during the daytime and provided some interpretive assistance to therapy staff. (*See* Doc. 53-2 at 78:8-15, 80:13-15.) Ms. Wing returned to Mercy Gilbert Medical Center after experiencing three straight days of nausea, vomiting, abdominal pain, and lethargy. (*See Id.* at 82:10-83:4; Doc. 65 at 6.)

Upon her return, hospital staff evaluated Ms. Wing and readmitted her with severe sepsis. (Doc. 65 at 6.) Her two sons—Plaintiffs William and Chester Wing—drove in from Utah following readmission. (Doc. 67-1 at 9:6-19.) Both sons, and Plaintiff Cherie Macaraeg, provided some interpretive assistance during the second hospital stay. (*See id.* at 12:6-16; Doc. 65 at 8, 11.)

Ms. Wing passed away about seven days after readmission and about one month after her fall. (Doc. 71 at 127.)

This lawsuit followed Ms. Wing's death. The complaint asserts claims on behalf of the Estate of Marie Rose Lennox Wing (the "Estate") and Plaintiffs Cherie Macaraeg, Audrey Bumbernick, William Wing, Chester Wing, and Clair Rosewood (the "Individual Plaintiffs"). (Doc. 1 ¶¶ 1-9, Doc. 48.) Relief is sought under the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), the Patient Protection and Affordable Care Act ("ACA"), and the Arizonans with Disabilities Act ("AzDA"). Plaintiffs argue Dignity Health violated these laws by requiring Ms. Wing to rely on her family members for ASL interpretation. (*See* Doc. 1 ¶¶ 67-68, ¶ 82. ¶ 102, ¶¶ 119-20.)

Plaintiffs further argue a live, in-person interpreter was required for each hospital visit. (*See id.*) Had an interpreter been present, "hospital staff would have known about [Ms. Wing's] pain and worsening condition," possibly preventing her death. (*See* Doc. 1 ¶¶ 50-51.) The complaint seeks declaratory relief, an injunction, and damages. (*Id.* at 16-19.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted); *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (holding the court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted).

## III.   DISCUSSION

### A.   Standing

Dignity Health challenges Plaintiffs' standing to sue. It argues all Plaintiffs lack standing to bring claims under the ADA and the AzDA. (Doc. 53-1 at 13-14.) It further argues the Individual Plaintiffs cannot seek relief under Section 504 and the ACA.[2]

"Article III of the United States Constitution limits federal court jurisdiction to 'actual, ongoing, cases or controversies.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). Federal courts determine when an ongoing case or controversy exists through the doctrine of standing.

---

[2] During oral argument, Dignity Health repeatedly stated only the Estate could pursue damages under Section 504 and the ACA. The Court construes this argument as challenging the Individual Plaintiffs' standing under both statutes.

- 3 -

*See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a party invoking federal jurisdiction must demonstrate they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the [opposing party], and (3) that is likely to be redressed by a favorable judicial decision." *See Lake v. Fontes*, 83 F.4th 1199, 1202-03 (9th Cir. 2023) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

### 1.     Standing Under the ADA and the AzDA

Plaintiffs bring claims under Title III of the ADA and the AzDA.[3] (Doc. 1 at 7-10, 14-16.) Title III states "[n]o individual shall be discriminated against on the basis of disability" for "services" in places of public accommodation. 42 U.S.C. § 12182(a). Discrimination includes "a failure to take such steps as may be necessary to ensure that no individual with a disability is . . . denied services . . . or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii). Only individuals can pursue relief under Title III. 42 U.S.C. § 12188(a). The only remedy available is injunctive relief. *Id.*

Both disabled and non-disabled individuals can pursue relief under Title III. For non-disabled individuals, Title III confers associational standing for discrimination occurring because of their relationship with a disabled person. *See* 42 U.S.C. § 12182(b)(1)(E); *George v. AZ Eagle TT Corp.*, 961 F. Supp. 2d 971, 974 (D. Ariz. 2013). This Court has previously explained associational discrimination requires a "specific, direct, and separate injury" under Article III. *See George*, 961 F. Supp. 2d at 974 (quoting *Glass v. Hillsboro Sch. Dist. 1J*, 142 F. Supp. 2d 1286, 1288 (D. Or. 2001)). An injury is separate and distinct when it harms a non-disabled person's individual rights. *See id.* at 975. Injuries that are entirely derivative or ancillary to another person's discrimination, however, are not enough. *See Glass*, 142 F. Supp. 2d at 1289-90.

The Individual Plaintiffs testified in their depositions that Ms. Wing, if given the option, would have preferred a live, in-person interpreter to communicate with hospital

---

[3] The AzDA is intended to "mirror Title III of the ADA." *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 962 n.3 (9th Cir. 2019). This means both laws have the same Article III standing requirements. *Strojnik v. Hyatt Hotels Corp.*, CV-21-00741-PHX-DWL, 2022 WL 504480, at *9 (D. Ariz. Feb. 18, 2022).

staff. (*See* Doc. 71 at 44:8-10.) They testified that they interpreted for Ms. Wing only because Dignity Health lacked readily available resources. (*See id.* at 42:16-43:5.) The Individual Plaintiffs argue having to step outside of their supportive family roles to become interpreters was discriminatory; it treated them differently than companions of non-deaf patients. (*See* Doc. 67 at 17.)

The Individual Plaintiffs do not present evidence showing they intended to utilize interpretive services. Nor do they provide support for their argument remaining in a supportive family role is an individual right. *See George*, 967 F. Supp. 2d at 976. Ms. Wing was the only person harmed by Dignity Health's supposed lack of ASL interpretive services. Any harm experienced by the Individual Plaintiffs was derivative or ancillary to her injury. The Individual Plaintiffs lack a separate and distinct injury to confer associational standing under Title III and the AzDA. *See Glass*, 142 F. Supp. 2d at 1289-90.

The Estate also cannot bring claims under Title III or the AzDA. Only individuals can pursue injunctive relief under Title III. 42 U.S.C. § 12188(a). When an individual dies, their Title III claim is "moot as there is necessarily no prospect for future injury." *Kalani v. Starbucks Coffee Co.*, 698 Fed. Appx. 883, 885 (9th Cir. 2017). Ms. Wing's death renders the Estate's Title III and AzDA claims moot.

Neither the Estate nor the Individual Plaintiffs can pursue relief under Title III or the AzDA. Defendant Dignity Health is granted summary judgment for both claims.

**2.     Individual Plaintiffs' Standing Under Section 504 and the ACA**

Plaintiffs bring claims under Section 504 and the ACA.[4] (Doc. 1 at 10-14.) Section 504 states "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation

---

[4] Discrimination claims under Section 504 and the ACA have the same elements. *Bustos v. Dignity Health*, CV-17-02882-PHX-DGC, 2019 WL 3532158, at *1 (D. Ariz. Aug. 2, 2019); *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 954 (9th Cir. 2020) ("[W]e can assume that the case law construing the Rehabilitation Act generally applies to claims under [the ACA] for disability discrimination . . . ."). Both statutes also have substantially similar legal standards. *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020) (stating discrimination claims under the ACA "must allege facts adequate to state a claim under Section 504"). The similar standards mean both statutes have the same standing requirements.

in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Section 504 gives a remedy to "any person aggrieved by any act or failure to act by any recipient of" federal financial assistance. 29 U.S.C. § 794a(a)(2). The use of "any person" signals Congress's "intention to define standing to bring a private action under [section 504] . . . as broadly as is permitted by Article III of the Constitution." *Barker v. Riverside Cnty. Off. of Educ.*, 584 F.3d 821, 826 (9th Cir. 2009). Section 504 further must be interpreted consistently with the ADA. *See Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 734 n.2 (9th Cir. 2021) ("[W]e note that the ADA and section 504 are interpreted coextensively because there is no significant difference in the analysis of rights and obligations created by the two Acts." (internal quotation marks)).

Section 504's consistent interpretation with the ADA means it allows for claims of associational discrimination. *See Cortez v. City of Porterville*, 5 F. Supp. 3d 1160, 1166 (E.D. Cal. 2014). But, as discussed above, the Individual Plaintiffs do not present evidence showing an injury separate and distinct from Ms. Wing. *See Payan*, 11 F.4th at 734 n.2. Dignity Health is granted summary judgment for the Individual Plaintiffs' claims under Section 504 at the ACA. The Individual Plaintiffs lack standing to continue in this action. Only the Estate's claims under Section 504 and the ACA remain.

### B.   Effective Communication Under Section 504 and the ACA

Dignity Health challenges the merits of the Estate's claims under Section 504 and the ACA. It argues "facts support the conclusion that no discriminatory policy or practice existed, and that summary judgment in Dignity Health's favor" is appropriate. (*See* Doc. 53-1 at 16.) Alternatively, if summary judgment is not appropriate, Dignity Health argues the Estate cannot recover compensatory damages. (Doc. 72 at 13-14.)

#### 1.   Effective Communication Claim

Discrimination claims under Section 504 and the ACA have the same elements. *Bustos*, 2019 WL 3532158, at *1; *Schmitt*, 965 F.3d at 954 (9th Cir. 2020). A discrimination claim, under these circumstances, requires showing (1) the plaintiff is a

qualified individual with a disability; (2) who "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of [the plaintiff's] disability." *Updike*, 870 F.3d at 949 (quoting *Duvall v. City of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Dignity Health concedes the first two elements. The parties primarily disagree over the third element, namely whether Dignity Health provided "effective communication" to Ms. Wing during her hospital visits. (*See* Doc. 71 at 14-18; Doc. 72 at 14-15); *See Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 866 (9th Cir. 2022) (explaining effective communication comes from implementing regulations promulgated by the Department of Health and Human Services).

Section 504 and the ACA "include an affirmative obligation for public entities to make benefits, services, and programs accessible to people with disabilities." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017). For individuals with hearing disabilities, that obligation includes taking "appropriate steps to ensure [] communications with disabled persons are as effective as communications with others." *See id.* (quoting 28 C.F.R. § 35.160(a)) (internal quotation marks omitted). Effective communication, in the hospital setting, requires assessing "whether the hospital provided the kind of auxiliary aid necessary to ensure that a deaf patient was not impaired in exchanging medically relevant information with hospital staff." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 835 (11th Cir. 2017); *see also Bax*, 52 F.4th at 866-67 (citing *Silva* to articulate the standard for effective communication).

Assessing whether a hospital "provided appropriate auxiliary aid . . . to afford effective communication is a fact-intensive exercise." *Bax*, 52 F.4th at 867 (quoting *Updike*, 870 F.3d at 958) (internal quotation marks omitted). There is no categorical rule defining when auxiliary aid is required. *See id.* at 867. The test instead is context specific, requiring a day-to-day analysis that weighs factors like "the method of communication used by the individual; the nature, length, and complexity of the communication involved;

and the context in which the communication is taking place." *Id.* at 867, 869 (quoting *Updike*, 870 F.3d at 950) (internal quotation marks omitted). A hospital, as the entity covered by Section 504 and the ACA, bears "the ultimate decision as to what measures to take" to ensure effective communication occurs. *See Tauscher*, 931 F.3d at 963 (quoting 28 C.F.R. § 36.303(c)(1)(ii)). Requests for accommodation "perform[] a signaling function" that may put a hospital on notice auxiliary aids are needed. *See Bax*, 52 F.4th at 869 (quoting *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 270 (D.D.C. 2015)).

Dignity Health presents Ms. Wing's medical records to show that effective communication occurred. (Doc. 72 at 13.) The records indicate hospital staff used video remote interpreting ("VRI") services during some visits with Ms. Wing. (*See, e.g.*, Doc 65 at 4.) On other occasions, staff communicated through a bedside ASL interpreter or written notes. (*See id.* at 7, 24.) The medical records also indicate Ms. Wing sometimes refused interpretive services offered by Dignity Health in favor of family members acting as interpreters. (*See* Doc. 65 at 8.) Each relative had a different level of ASL proficiency.

In response, the Estate offers deposition testimony from the Individual Plaintiffs stating that family members acted as interpreters because Dignity Health lacked ASL resources.[5] (*See, e.g.*, Doc. 71 at 108:20-109:6.) Some of the conversations interpreted by family members included discussions about Ms. Wing's symptoms and medical conditions. (*See id.* at 75:11-76:11.) The Estate argues any interpretations involving medical terms was not effective communication because the family members did not have professional training in ASL. (Doc. 71 at 3-4, 15-16.)

Both parties present competing evidence on Ms. Wing's ability to effectively communicate. Dignity Health presents evidence indicating Ms. Wing chose to have family members interpret for her and denied services offered by hospital staff. (*See* Doc. 65 at 8.) While the Estate presents evidence stating family members only interpreted due to a lack of available services from Dignity Health. (*See* Doc. 71 at 108:20-109:6.)

---

[5] The record is unclear as to whether the Individual Plaintiffs were the only family members who interpreted for Ms. Wing or if other family members also interpreted for her.

The Court finds this creates a genuine dispute of material fact for the Estate's Section 504 and ACA claims. If family members were forced to interpret conversations about symptoms and medical conditions, the claims would likely succeed because family members lacked professional ASL training and risked misinterpreting medical terms. *See Bax*, 52 F.4th at 867 (stating the test is whether aid was provided to prevent a real hindrance to communication). On the other hand, if Ms. Wing declined interpretive services offered by Dignity Health and chose to rely on family members, the claims would fail. *See id.* at 866 (noting services only need to be available). Choosing between the competing evidence is best left for the jury.

Dignity Health correctly notes it is undisputed Mercy Gilbert Medical Center and Chandler Regional Medical Center had "policies, practices, and resources" for ASL interpretation in place during Ms. Wing's visits. (Doc. 53-1 at 16.) But summary judgment would require showing Ms. Wing could effectively communicate in each interaction with hospital staff. *See Bax*, 52 F.4th at 867. Meeting this standard requires Dignity Health provide evidence supporting a day-to-day, context-specific explanation of how hospital staff interacted with Ms. Wing. *See id.* at 867, 869. The evidence provided could support a reasonable jury finding interpretive services were used on some occasions. (*See, e.g.*, Doc 65 at 4.) And it also could support a reasonable jury finding Ms. Wing, on other occasions, refused services in favor of family members interpreting on her behalf. (*See id.* at 8.) The evidence, however, does not provide the complete day-to-day demonstration needed for summary judgment. *See Bax*, 52 F.4th at 867, 869. Entire days are missing from the medical records provided by Dignity Health in support of its motion for summary judgment. *See Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994) (stating no party should presume that the Court will scour the record for facts or theories that might support either party's case). Reasonable inferences must be drawn in favor of the Estate, as the non-moving party. Summary judgment will be denied for this issue.

### 2.     Compensatory Damages

Title VI includes an implied right of action. *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 72-73 (1992). Inherent in that right is the ability to pursue compensatory damages. *See id.* Compensatory damages, however, are only available when a federal funding recipient intentionally discriminates against a disabled person. *See Updike*, 870 F.3d at 950. Within the context of Section 504 and the ACA, intentional discrimination is an "additional hurdle" to the normal elements of a discrimination claim. *See Bax*, 52 F.4th at 866; *Schmitt*, 965 F.3d at 954.

Intentional discrimination requires deliberate indifference. *See Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). The Ninth Circuit Court of Appeals explains deliberate indifference as requiring "both knowledge that a harm to a federally protected right is substantially likely" and that a funding recipient failed to act on the likelihood. *See id.* A plaintiff satisfies the first element—substantial likelihood of harm to a federally protected right—by alerting the funding recipient about the "need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation)." *Id.* The second element—failure to act on a substantial likelihood of harm—requires "conduct that is more than negligent and involves an element of deliberateness." *Id.*

The Estate presents deposition testimony stating family members requested that Dignity Health provide interpretive services that were not fulfilled. (Doc. 71 at 86:5-87:9.) In response, Dignity Health presents medical records indicating Ms. Wing refused services in favor of family members acting as interpreters. (*See* Doc. 65 at 8.) Dignity Health argues Ms. Wing's refusals show any interpreting done by family members was because of Ms. Wing's preferences, not because interpretive services were not offered. (*See* Doc. 72 at 13.) The Court finds this evidence creates a genuine issue of material fact on the substantial likelihood element. A jury could conclude alerting Dignity Health about the need for an accommodation provided sufficient notice. *Duvall*, 260 F.3d at 1139. But a jury could also conclude Ms. Wing, by continually refusing services offered by Dignity Health, waived any accommodations. *See Bax*, 52 F.4th at 866 (noting auxiliary aids only need to be

available).

Plaintiffs also present deposition testimony stating hospital staff exhibited a noticeable frustration toward Ms. Wing due to her need to communicate through ASL. (Doc. 71 at 94:13-95:16.) One example includes Plaintiff Cherie Macaraeg testifying about how a nurse was "very cold and off-putting" toward Ms. Wing, making no effort to communicate with her even though the nurse was responsible for Ms. Wing during night shifts. (*See id.*) Dignity Health, in response, again presents evidence showing Ms. Wing refused services offered by hospital staff, arguing the refusals indicate any lack of services was because of Ms. Wing's preferences. (*See* Doc. 65 at 8; Doc. 72 at 13.) The Court finds this evidence creates a genuine issue of material fact on the failure to act element. The behavior described in Plaintiff Cherie Macaraeg's testimony provides some evidence that could lead a jury to finding deliberateness. By contrast, if a jury determines that Dignity Health continued to offer services but was refused, compensatory damages would be unavailable.

With there being a genuine issue of material fact on both elements of compensatory damages, summary judgment is denied.

### C. Other Relief Under Section 504 and the ACA

Dignity Health argues the Estate cannot pursue injunctive relief under Section 504. (*See* Doc. 53-1 at 14-16.) It also argues *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022), precludes the Estate from recovering non-compensatory money damages as a matter of law. (*See* Doc. 53-1 at 14-15; Doc. 72 at 6-12.)

#### 1. Injunctive Relief

A plaintiff asserting claims under Section 504 can pursue both injunctive relief and damages, depending on the circumstances and nature of the case. *See Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 869 (9th Cir. 2014). Injunctive relief under Section 504 requires demonstrating a threat of future harm. *See Updike*, 870 F.3d at 948. "[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). But past

wrongs alone do not in themselves amount to a threat of future harm. *See id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)). A plaintiff instead must point to policies or conduct that pose a realistic possibility of future wrongful behavior. *See id.* A plaintiff then must present evidence indicating the future wrongful behavior will result in personal harm. *See id.* Failure to satisfy either requirement results in an injury being too speculative for injunctive relief. *Id.*

The Estate cannot pursue injunctive relief because Ms. Wing's death means there is "necessarily no prospect for future injury." *Kalani*, 698 Fed. Appx. at 885. Dignity Health is granted summary judgment on this issue.

### 2.     Other Money Damages

Besides compensatory damages, the Estate seeks emotional distress damages and expectation damages under Section 504 and the ACA. (Doc. 71 at 208-09.)

#### i.     Emotional Distress Damages

In *Cummings*, the United States Supreme Court considered "whether emotional distress damages are available under the Spending Clause statutes." 596 U.S. at 220. The Court identified "Spending Clause statutes" as legislation passed under Congress's authority to "fix the terms on which it shall disburse federal money." *Id.* at 217-18. The Court identified certain Spending Clause statutes enacted to "prohibit[] recipients of federal financial assistance from discriminating based on certain protected grounds." *Id.* at 217-18. The two statutes directly at issue in *Cummings* were the Rehabilitation Act and the Affordable Care Act. *Id.* at 218.

Laws passed by Congress under the Spending Clause "operate[] based on consent." *Id.* at 219. The government imposes conditions on federal funds, and the recipient agrees to those conditions by accepting federal money. *See id.* This creates a dynamic similar to contract law where a recipient "cannot knowingly accept the deal with the [f]ederal [g]overnment unless they would clearly understand . . . the obligations that would come along with doing so." *Id.* (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)) (internal quotation marks omitted). The Court explained these

1  similarities required applying a clear-notice rule to the issue of emotional distress damages.
2  *See id.*; *Roe ex rel. Roe v. Critchfield*, 2025 WL 1486985, at *10-11 (9th Cir. 2025)
3  (explaining *Cummings* combines with *Pennhurst State School & Hospital v. Halderman*,
4  451 U.S. 1 (1981), to require any conditions on federal money be unambiguous).

With clear notice required, the Court shifted its inquiry to "[w]ould a prospective funding recipient, at the time it 'engaged in the process of deciding whether [to] accept' federal dollars, have been aware that it would" potentially face emotional distress damages as a form of liability. *Id.* at 220 (quoting *Arlington*, 548 U.S. at 296). The Court held recipients were not on notice because a typical breach of contract claim only allows for the recovery of compensatory damages and injunctive relief. *See id.* at 221. Without clear notice, the Court concluded it could not "treat federal funding recipients as having consented to be subject to damages for emotional distress." *Id.* at 222. Thus, claimants under the Rehabilitation Act and the ACA could not recover emotion distress damages. *Id.*

The Estate attempts to distinguish this case from *Cummings*. (Doc. 67 at 12.) It argues *Cummings* "only addressed the availability of emotional distress damages under Title VI and the statutes incorporating its remedies." (*Id.*) Here, the Estate attempts to assert "emotional distress damages independent of Title VI," which is claims is a different type of emotional distress damages. (*See id.*)

The question before the Court in *Cummings* was "whether emotional distress damages are available under" the Rehabilitation Act and the ACA generally. *See* 596 U.S. at 218, 222 ("It follows that [emotional distress] damages are not recoverable under the Spending Clause statues we consider here."). There was no specific limitation to Title VI. *See id.* at 217-18, 222. The Court's reasoning applies to all legislation passed under Congress's authority to "fix the terms on which it shall disburse federal money." *See id.* Indeed, it was the contract-law dynamic created by Congress's Spending Clause power that prompted the Court to find funding recipients are only liable to the extent they are on notice certain damages are available when accepting federal money. *See id.* at 222. The Ninth Circuit Court of Appeals, recognizing this understanding, has applied *Cummings*'

reasoning to areas outside of Title VI. *See, e.g.*, *Roe ex rel. Roe*, 2025 WL 1486985, at *10-11 (applying *Cummings* to Title IX of the Education Amendments of 1972).

The Court finds *Cummings* entirely precludes the recovery of emotional distress damages under Section 504 and the ACA. Dignity Health is granted summary judgment on this issue.

### ii. Expectation Damages

The Estate quantifies its expectation damages as costs Dignity Health "saved by conscripting Plaintiffs to interpret." (Doc. 67 at 10.) Alternatively, the Estate suggests "the Court may consider hospital bills because Plaintiffs did not receive the full value of the services in the way a hearing patient would." (*Id.*)

*Cummings* instructs any remedy sought under Section 504 or the ACA must be "provided in the relevant legislation" or "traditionally available in suits for breach of contract." 596 U.S. at 220-21. The damages sought by the Estate are best categorized as consequential damages. *See* Richard A. Lord, 24 *Williston on Contracts* § 64:16 (4th ed. 2022) ("Consequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach."). Expectation damages are a subcategory of consequential damages and are generally available under contract law principles. *See id.* § 64.3; Restatement (Second) of Contracts § 347 cmt. A (Am. L. Inst. 1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.").

Measuring expectation damages requires considering: "(a) the loss in the value of the other party's performance caused by its failure or deficiency, plus; (b) any other loss, including incidental or consequential loss, caused by the breach, less; (c) any cost or other loss that he had avoided by not having to perform." Restatement (Second) of Contracts, *supra*, § 347. The recovery of expectation damages is limited to "an amount that the evidence permits to be established with reasonable certainty." *Id.* § 352.

Expectation damages are available under *Cummings* because they are "traditionally available in suits for breach of contract." *See* 596 U.S. at 220-21. This means, in theory, the Estate can pursue expectation damages. *See Luke v. Lee County.*, 1:20-CV-388-RP, 2023 WL 6141594, at *1 (W.D. Tex. Sept. 20, 2023) (collecting cases related to the availability of expectation damages post-*Cummings*). But the Estate does not present any evidence supporting its argument Dignity Health saved money by conscripting Plaintiffs to interpret. (*See* Doc. 67 at 10.) Nor does it present evidence supporting its argument Ms. Wing "did not receive the full value of services in the way a hearing patient would." (*See id.*) As the party with the burden of proof at trial, the Estate must make some showing sufficient to establish the existence of a genuine issue of material fact on damages. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Estate has failed to meet the "reasonable certainty" standard required for expectation damages. *See* Restatement (Second) of Contracts, *supra*, § 352. Dignity Health is granted summary judgment on this issue.

## IV. CONCLUSION

For the foregoing reasons,

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

1    **IT IS THEREFORE ORDERED** granting in part and denying in part Defendant Dignity Health's Motion for Summary Judgment (Doc. 53) as discussed herein. The motion is granted, and summary judgment is awarded to Dignity Health on the Estate's claims under the ADA and AzDA. Summary judgment is also awarded to Dignity Health on the issues of injunctive relief, emotional distress damages, and expectation damages under Section 504 and the ACA. The Estate cannot pursue those forms of relief at trial. Finally, summary judgment is awarded to Dignity Health on the Individual Plaintiffs' claims under the ADA, AzDA, Section 504, and the ACA. The Individual Plaintiffs lack standing and cannot proceed in this action. The motion for summary judgment is denied in all other respects.

Dated this 3rd day of June, 2025.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge